Louis M. Phillips (LA State Bar No. 10505)
*Pro Hac Vice* Pending
KELLY HART & PITRE
301 Main Street, Suite 1600
Baton Rouge, LA 70801
Telephone:  225/381-9643
Facsimile:  225/338-5308
Email:  louis.phillips@kellyhart.com

Jeffrey W. Dulberg (State Bar No. 181200)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: 310/277-6910
Facsimile:  310/201-0760
E-mail:  jdulberg@pszjlaw.com

*Attorneys for Bonial & Associates, PC*

Glenn E. Glover (AL State Bar No. 2983G53G)
*Pro Hac Vice Pending*
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Phone: (205) 521-8000
Facsimile: (205) 488-6647
Email: gglover@bradley.com

*Attorney for Newrez LLC d/b/a Shellpoint
Mortgage Servicing*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re: | Case No. 6:21-bk-15024-WJ |
| JOSE I. GRANADOS AND VICTORIA ANN GUTIERREZ VAUGHN, | Chapter 13 |
| Debtors. | **SUPPLEMENTAL RESPONSE OF BONIAL & ASSOCIATES, PC AND THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATE HOLDERS OF THE CWMBS INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-OA5, MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2006-OA5, AS SERVICED BY NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING TO AMENDED ORDER TO SHOW CAUSE** |
| | [Relates to Docket No. 94] |

*(vertical left margin)* PACHULSKI STANG ZIEHL & JONES LLP — ATTORNEYS AT LAW — LOS ANGELES, CALIFORNIA

1

DOCS_LA:346385.3 10224/001

| | |
|---|---|
| 1 | **Hearing** |
| 2 | Date:       January 24, 2023 |
| | Time:       10:00 a.m. |
| 3 | Location:   U.S. Bankruptcy Court |
| | Courtroom 304 |
| 4 | 3420 Twelfth Street |
| | Riverside, CA 92501 |
| 5 | Judge:      Hon. Wayne E. Johnson |

**TO THE HONORABLE WAYNE E. JOHNSON, UNITED STATES BANKRUPTCY JUDGE, THE DEBTORS, NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, THE U.S. TRUSTEE, AND PARTIES REQUESTING SPECIAL NOTICE:**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:346385.3 10224/001

# TABLE OF CONTENTS

**Pages**

Relevant Procedural History ............................................................................................. 3

    A.    The Chapter 13 Plan ............................................................................... 3

    B.    The Plan Objection & the Original POC .................................................. 4

    C.    The July 6 Hearing ................................................................................. 5

    D.    The Stipulation. ...................................................................................... 7

    E.    The OSC and November 7 Hearing ....................................................... 8

INTRODUCTORY STATEMENT ................................................................................. 10

LEGAL AUTHORITY ................................................................................................... 12

The Projected Escrow Shortage is an arrearage. ............................................................ 12

    A.    The Escrow Deficiency and Shortage Amounts Stated in Part 3 of the
             Form 410A Attached to the Original POC Comply with the Official
             Instructions for Form 410A. ................................................................ 13

             The Original POC was properly calculated from the date of
             conversion. ........................................................................................... 13

             The Negative ($142.07) Amount Stated For "Escrow Deficiency For
             Funds Advanced" In Part 3 Of The Initial 410A Complies With The
             Form 410A Instructions. ...................................................................... 14

             The $4,503.60 Amount Stated For "Projected Escrow Shortage" In
             Part 3 Of The Initial 410A Complies With The Form 410A
             Instructions. ......................................................................................... 15

    B.    A projected escrow shortage is an arrearage ....................................... 19

    C.    The Significant Sum of the Escrow "Deficiency" and "Shortage"
             Components in Part 3 of the Initial 410A had Multiple Causes -- The
             Debtors' (Actual) Payment History. ..................................................... 22

    D.    Chapter 13 Plans should not be confirmed unless they address
             prepetition claims. ............................................................................... 24

    E.    In order to effectuate confirmation after the Shellpoint Objection was
             resolved, the Original POC was amended. ............................................ 25

    F.    These facts cannot give rise to a Rule 11 or ethical violation, or any
             sort of sanction. ................................................................................... 26

CONCLUSION .............................................................................................................. 28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

# TABLE OF AUTHORITIES

**Pages**

## CASES

*In re Breit*
490 B.R. 821 (Bankr. N.D. Ind. 2013) ........................................................... 21, 26

*In re Campbell*
Case No. 17-31411, 2018 WL 2339334 (Bankr. N.D. Ohio May 22, 2018) ............... 7, 20, 21, 26

*In re Chew*
627 B.R. 112 (Bankr. E.D. Pa. 2021) ........................................................... 18, 21, 26

*In re Tracy*
No. BR 20-40074-JMM, 2021 WL 4143994, at *10 (Bankr. D. Idaho Sept. 9, 2021) ................. 14

*JPMorgan Chase Bank, National Association v. DeGuiseppi*
2019 WL 1724629, at*1 ........................................................... 7, 19, 20, 21, 26

*Truesdell v. S. California Permanente Med. Grp.*
293 F.3d 1146 (9th Cir. 2002) ........................................................... 27

## STATUTES

11 U.S.C. § 348(a) ........................................................... 13

11 U.S.C. § 506 ........................................................... 20

11 U.S.C. § 1305(a) ........................................................... 13, 14

11 U.S.C. § 1332(e) ........................................................... 20

12 U.S.C. § 2601 ........................................................... 17

## OTHER AUTHORITIES

12 C.F.R. § 1024.17 ........................................................... 15, 19, 23

Real Estate Settlement Practices Act ........................................................... 6, 7, 10, 11, 15-28

## RULES

Fed. R. Bankr. P. 3001(c)(2)(C) ........................................................... 15, 17

Fed. R. Bankr. P. 3002(c) ........................................................... 14

Fed. R. Bankr. P. 9011 ........................................................... 9, 27

Fed. R. Civ. P. 11 ........................................................... 27

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:346385.3 10224/001

Bonial & Associates, PC ("Bonial"), together with The Bank of New York Mellon FKA The Bank of New York, as Trustee for The Certificate holders of the CWMBS Inc., CHL Mortgage Pass-Through Trust 2006-OA5, Mortgage Pass Through Certificates, Series 2006-OA5, as serviced by NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint," together with Bonial, the "Respondents") hereby respond to this Court's *Amended Order to Show Cause Regarding Sanctioning (1) Bonial & Associates, P.C. and (2) Newrez LLC D/B/A Shellpoint Mortgage* (docket #94) (the "OSC"),[1] and respectfully states as follows:[2]

**Relevant Procedural History**

On September 21, 2021, Jose L. Granados and Victoria Ann Gutierrez Vaughn (the "Debtors") filed a joint petition for relief under chapter 7 of the Bankruptcy Code commencing the above-captioned bankruptcy case (the "Bankruptcy Case"). Along with their petition, the Debtors filed schedules, which reflected a monthly income of $9,576.32, monthly expenses of $9,582.04—resulting in an approximate $6 shortfall per month. *See* Docket #1 at p.11

On February 8, 2022, the Debtors moved to convert their Bankruptcy Case to one under chapter 13 of the Bankruptcy Code, and the Bankruptcy Case was so converted by order of this Court entered on February 28, 2022 (the "Conversion Date"). Docket # 30, 35. Proofs of claim were due to be filed no later than May 9, 2022. Docket # 36.

**A. The Chapter 13 Plan**

On March 12, 2022, the Debtors filed their *Chapter 13 Plan* [docket # 51] (the "Original Plan"). In the Original Plan, the Debtors' proposed a $460 monthly plan payment for the first two months, then a $2,010 monthly plan payment for months three through sixty. Original Plan, at ¶A. The Debtors proposed to pay the Shellpoint first position mortgage on that certain residence at 6158

---

[1]    At that certain November 7, 2022 hearing (the "November 7 Hearing") in this matter, the Court set a further hearing date on its Amended Order to Show Cause Regarding Sanctioning (1) Bonial & Associates, P.C. and (2) NewRez LLC D/B/A Shellpoint Mortgage (docket #94) (the "OSC") for January 24, 2023 and indicated that the parties would have an "opportunity for further briefing." November 7 Hearing, p.48:1-2. Therefore, the Respondents submit this Supplemental Response to the OSC.

[2]    This Supplemental Response is intended to supplement prior responses, and to offer the Court a full-fledged discussion of the issued raised by the Court through the OSC.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Royal Diamond Court, Corona, California 92880 (the "<u>Mortgage</u>") outside the Original Plan directly to Shellpoint and stated that the "amount of arrearage, if any" was $0.00. *See* Original Plan, at Class 4.

### B. The Plan Objection & the Original POC

On March 18, 2022, Shellpoint, through Bonial filed that certain *Objection to Confirmation of Plan* (Docket # 53) (the "<u>Plan Objection</u>"). In the Plan Objection, Shellpoint raised two primary issues with the Original Plan. ***First***, the Original Plan provided for no arrearages but as would be later contained in its proof of claim, there was an arrearage. ***Second***, the Debtors' income as scheduled was insufficient to make the proposed plan payments.

Shortly after the Plan Objection was filed, on March 29, 2022, the Debtors filed amended Schedules I and J, reflecting a monthly income of $11,104.58 and monthly expenses of $9,044.22. Docket # 57. Therefore, rather than the previously asserted negative income, the Debtors' monthly net income was shown to be $2,060.36.

On May 9, 2022, Shellpoint timely filed *Proof of Claim No. 19-1* (the "<u>Original POC</u>") through Bonial. In the Original POC, Shellpoint asserted a secured proof of claim for the Mortgage. With respect to a claim for arrearages, the Original POC claimed an amount due for principal and interest of $2,739.75 (representing the payment that was due, but unpaid, for February 1, 2022, less the escrow component), and for late fees due as of February 28, 2022 of $547.96. Also, and as required, Shellpoint submitted with the Original POC (i) the required *Mortgage Proof of Claim Attachment, Form 410A* ("<u>Official Form 410A</u>") and (ii) the *Annual Escrow Account Disclosure Statement* [Original POC, p. 40] (the "<u>Escrow Disclosure</u>") and an *Annual Escrow Account Disclosure Statement - Projections for Coming Year* [Original POC, p. 41] (the "<u>Escrow Projection</u>"). The Escrow Disclosure reflected that as of conversion, February 28, 2022, the Debtors' escrow account was "negative" $142.07 for amounts expended by Shellpoint from escrow for which Shellpoint could claim reimbursement (the "<u>Deficiency</u>"), and the Escrow Projection showed that as of conversion, the Debtors' escrow account was $4,503.60 short for amounts projected to be due in the upcoming year (the "<u>Projected Escrow</u>

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Shortage"). These amounts were included in Part 3 of Official Form 410A entitled "Arrearage as of the Date of Petition" as follows:

| Part 3: Arrearage as of Date of the Petition | |
|---|---|
| Principal & interest due: | $2,739.75 |
| Prepetition fees due: | $547.96 |
| Escrow deficiency for funds advanced: | $142.07 |
| Projected escrow shortage: | $4,503.60 |
| Less funds on hand: | − $0.00 |
| Total prepetition arrearage: | $7,933.38 |

Original POC, p. 4.

### C. The July 6 Hearing

On June 1, 2022, the Debtors filed their *First Amended Chapter 13 Plan* (docket # 61) (the "Amended Plan"). The Amended Plan reduced the plan payments to $460 for month one; $1,355 for month two; and $1,455 for months three through sixty. Amended Plan, § 1.A. The Debtors reclassified Shellpoint to Class 3, and still provided that the Debtors would make regular payments directly to Shellpoint in accordance with the applicable contract. Amended Plan, Class3A. The Amended Plan contained no provision for payment of an arrearage, but provided that Shellpoint would be unimpaired under the Amended Plan. *Id*. The problem with this approach is that it did not resolve Shellpoint's arrearage claim.

On June 2, 2022, the Debtors filed their *Objection to Proof of Claim # 19-Shellpoint Mortgage* (Docket # 64) (the "Debtors' Objection"). In the Debtors' Objection, the Debtors lament that other than the $547.96, there were no known arrears on the Mortgage and that getting information regarding the asserted arrearage from Shellpoint was challenging. The Debtors attached certain correspondence from Bonial from April 15, 2022 that indicated there was the $547.06 late fee and "an escrow shortage." In the attached email, the Bonial attorney states that the forthcoming proof of claim for Shellpoint would contain "one delinquent payment, late charges, and projected escrow shortage as of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the conversion date." *See* Docket #64-5. Bonial informed the Debtors that if the Debtors agreed to "add an escrow shortage repayment over 12 months, consistent with RESPA process" then Shellpoint would amend its proof of claim to $0. *Id*.[3] The reference to the "RESPA process" is to the right of a lender, RESPA[4], to collect a shortage over a 12 month period through adding a monthly pro-rated amount to the monthly statements to cure the shortage.

On July 6, 2022, the Court held a hearing on the Debtors Objection. At the hearing, the Debtors' attorney stated that: "our understanding is arrears means past due mortgage payments, where they do impound taxes and they do impound insurance. If Mr. Nagel is saying their concern is about future escrow payments… that should be designated in a separate section or notated on their claim. But how they filed their claim, your Honor, was that it was arrears, meaning past due and owing." July 2 Hearing Transcript, 5:1-10. Unfortunately, as shown herein, the Debtors' counsel's "understanding" is wrong, but more importantly, the Original POC specifically and expressly states each portion of the arrearages in accordance with Official Form 410(A), so the Debtors' view as to how the Original POC should have been stated was, simply, wrong.

The Court picked up on this line of thought and questioned whether the "Debtors need to do anything other than keep making on time the regular monthly payment in whatever the current amount is?" *Id*. at 6:8-11. To which, Mr. Nagel responded, "No, your Honor." *Id*. at 6:12.[5] The Court then asked, "[s]o, why list the 7,933 as an arrearage in the first place? Well, actually, why was there an objection to confirmation?" *Id*. at 6:13-15. The Court stated that the "we're very close to all of us agreeing that the word 'arrearage' [in the Plan Objection] is just flat out wrong. That there was no

---

[3]     As of the date of the Debtors Objection, the Debtors had made the payment due February 1, 2022, that was past due as of the date of conversion, February 29, 2022. This meant that the principal and interest component of the Original POC was no longer an arrearage.

[4]     The Real Estate Settlement Procedures Act, of 1974 (12 U.S.C. § 2601 *et seq*.)

[5]     As shown throughout, and as agreed to by the Debtors in the Stipulation, the statement by Mr. Nagel was correct. As of this hearing Mr. Nagel understood that the parties had an agreement, and in fact that agreement was subsequently formalized by the Stipulation. Under the Stipulation, Shellpoint has the right, under RESPA, to collect the Projected Escrow Shortage through monthly payments pursuant to monthly statements that include an additional monthly amount designed to make up the Projected Escrow Shortage over the term as determined by Shellpoint (subject to RESPA's directive that the term not be less than 12 months). As shown below, the Debtors had prior to conversion been paying amounts for projected escrow shortage through additional amounts added to monthly statements. .

arrearage.  You seem to be indicating that this is a future amount that's due, but you don't file an objection to confirmation [sic] to say, the Debtors must continue to make their monthly payments." *Id*. at 8:18-9:1.

As shown below, the Original POC was correctly filled out and the Debtors' counsel's understanding of what amounts and calculations should go into a principal residence mortgage claim was incorrect.  As well, it is not correct that the only component related to escrow shortage to be put into the arrearage claim is amounts past due as of the petition date (or in this case the Conversion Date), and in fact, as shown in *DeGuiseppi and Campbell* discussed below, and as provided by RESPA and Official Form 410(A), adding past due escrow amounts to an arrearage claim would be improper (and as is clear here, Shellpoint did not add the escrow portion of the payment due February 1, 2022 to its arrearage claim).

The Court opined from the bench that the Plan Objection was "wildly misleading." *Id*. at 12:13-16.  The Court then reset confirmation and indicated that a scheduling order would require further pleadings regarding a status of any settlement and "[i]f you put a stipulation and order that everybody agrees to, the stipulation and order can provide for that the pending objection to claim is resolved on that basis, as well as the objection to confirmation."  *Id*. at 16:6-14.

**D.  The Stipulation.**

On September 1, 2022, Shellpoint filed the Stipulation Resolving 1) Secured Creditor Shellpoint Mortgage's Objection to Confirmation; and 2) Debtors' Motion Re: Objection to Proof of Claim #19-Shellpoint Mortgage (Docket # 80) (the "Stipulation").  The Stipulation, to which the Debtors are parties, recounted Shellpoint's Plan Objection contentions, explained that the Debtors' schedules had been amended to reflect sufficient income, and noted that the Amended Plan was amended to pay the claim of Shellpoint outside the plan.  Stipulation, p. 1.  The Debtors and Shellpoint stipulated that:

> 1.    Debtors agree to adhere to all the terms and conditions provided for under their written loan agreement with Shellpoint Mortgage including payments as required to escrow account for payment of taxes and insurance. Any projected escrow payments, currently estimated to be $4,645.67 (which consists of $142.07 for an escrow deficiency and $4503.60 for projected

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

escrow shortage), will be paid as they have been paid from the payments made directly to Secured Creditor Shellpoint Mortgage that include a principal payment and escrow/insurance payment as indicated on monthly statements sent by Secured Creditor Shellpoint Mortgage to which Debtors will continue to pay as required.[6]

2.   Debtors stipulate with Secured Creditor Shellpoint Mortgage to pay the sum of $547.96 on or before September 30, 2022 for costs and fees.

3.   All payments due Secured Creditor must be paid to at the [NewRez].

4.   Secured Creditor Shellpoint Mortgage shall amend its Proof of Claim to reflect prepetition arrearage in the amount of $0.00 upon the execution of this Stipulation, payment of the costs and fees set forth in paragraph 2 above and withdraw their objection to confirmation.

5.   Debtors will withdraw [sic] their objection to Claim No. 19 with Secured Creditor Shellpoint Mortgage after execution of this Stipulation with Secured Creditor Shellpoint Mortgage and after amended Proof of Claim.

6.   Debtors and Secured Creditor agree to bear their own fees and costs in filing and opposing Secured Creditor's Objection to Confirmation of Plan and Debtor Objection to Secured Creditor's Proof of Claim.[7]

*Id.* at p. 2.

### E.   The OSC and November 7 Hearing

On September 28, 2022, the Court issued its OSC.  Therein, the Court determined that the Original POC contains "false information," specifically, it states "that the debtors owe a pre-petition arrearage of $7,933.38" and "this information in the [Original POC] is false."  OSC, p. 1.  The Court also pointed to the statement in the Plan Objection that the Debtors owe an arrearage in the amount of $7,933.38 as "false" because "the debtors have never owed a pre-petition arrearage of $7,933.38." *Id.* p. 2.  Because the Original POC had not yet been amended and the Objection to Plan remained pending

---

[6]   As shown below, the Debtors had, since 2020, been making additional payments to catch up prior projected escrow shortage amounts pursuant to monthly statements from Shellpoint.

[7]   Because the Debtors had by the date of the Stipulation paid the payment due as of February 1, 2022 outside the Plan, and therefore that portion of the arrearage claim was not owed as of the date of the Stipulation, the past due note payment was not included in the Stipulation as part of the arrearage. What was covered by the Stipulation was the Deficiency and the Projected Escrow Shortage, along with the late fees.  The Debtors agreed to pay these amounts, in a lump sum (late fees) and as they had been through monthly payments, upon monthly statements to be issued by Shellpoint (Deficiency and Projected Escrow Shortage).  The Debtors had prior to conversion been paying amounts for projected escrow shortage through additional amounts added to monthly statements (*see* discussion *infra* at II.C.).

"even though it is based on a false factual assertion," the Court ordered an in person status conference "to explain the false statements" in the Original POC and Plan Objection and resulting harm to the debtors; and pursuant to FED. R. BANKR. P. 9011(b)(1)(B) ordered Bonial and Shellpoint to show cause why monetary sanctions should not be imposed. *Id.* at p. 3.

Thereafter, in accordance with the Stipulation, on October 20, 2022 Shellpoint filed Proof of Claim No. 19-1 amending the Original POC (the "Amended POC"). In the Amended POC, Shellpoint left Part 3 of Official Form 410 A blank. *See* Amended POC, p. 4. The Stipulation required the Original POC to be amended to a $0 amount. Amending the Original POC in accordance with the Stipulation was consistent with and in fact required by the plan confirmation process in this jurisdiction, as "[t]he dollar amount of arrearage stated on a proof of claim controls over any amount listed…[in a plan]." See Form Plan, Class 3C; Class 4. Therefore, because no arrearage would be paid through the Amended Plan, the Original POC was amended to reflect a $0 arrearage, after the lump sum payment of the late fees required by the Stipulation.

On October 21, 2022, Bonial filed that certain Declaration of Austin Nagel in Response to the OSC (docket # 103) (the "Dec. in Response"). In the Dec. in Response, Mr. Nagel explained that after the July 6 Hearing, he met with the attorney for Debtors and reached the agreement reflected in the Stipulation which established stated arrears to be asserted through a proof of claim at $0 because: (i) "Principal and interest arrears were removed from the Shellpoint Claim by applying the Debtors' payment of $3,545.25 mailed by the Debtors prior to the conversion but received post conversion on March 3, and intended to be applied to the February 1, 2022 installment;" (ii) the Projected Escrow Shortage and Deficiency would be paid directly by the Debtors; and (iii) the prepetition $547.96 obligation for late fees would be paid by the Debtors. Dec. in Response, p. 3.

On September 23, 2022 the Debtors withdrew their *Objection to Proof of Claim* (Docket # 85). On September 26, 2022, the Debtors paid the agreed late fee amounts and, on October 5, 2022, due to the Debtors having complied with paragraph 5 of the Stipulation on September 26, 2022 by paying the agreed late fee amounts, Shellpoint filed a *Withdrawal of Objection to Confirmation of Plan*, withdrawing the Plan Objection (Docket # 100).

At the hearing on the OSC held on November 7, the Court characterized Bonial as "doubling down" and asserted the following:

- Bonial used a "misleading definition of 'projected escrow shortage'";

- Everything that Bonial contended regarding the correctness of their definition of projected escrow shortage was 'belied by the fact that [it] amended the proof of claim to zero, and in doing so, acknowledged the [Original POC] was wrong to begin with"; and

- Bonial and Shellpoint "leveraged [a] false proof of claim" by making a "demand" for the projected escrow shortage.

At the conclusion of the November 7 Hearing, the Court appears to have determined that Bonial and Shellpoint filed false documents with the Court and did not take "any responsibility whatsoever in the process and have actually engaged in an extensive effort to avoid taking responsibility for what has happened here."  November 7 Transcript, p. 47:10-16.  The Court then set a further hearing date for January 24, 2023 to which this Supplemental Response relates.

## INTRODUCTORY STATEMENT

With respect, the Respondents submit that this Court erred in concluding that the Original POC contained false information, that the Plan Objection contained false information, and that the Original POC contained false information because it was amended in accordance with the Stipulation to state a zero claim for arrearages.  As shown below, the Original POC for arrearages was indeed correct. *First*, the principal and interest amount claimed was a pre-conversion arrearage because the payment due February 1, 2022 had not been made as of February 28, 2022 (Shellpoint did not include the escrow portion of the February 1 past due payment as part of its arrearage claim).  *Second*, and as the Debtors agreed in the Stipulation, the $547.96 claim for late fees due as of February 28, 2022 was accurate.  *Third*, the Deficiency was correctly stated as the Debtors' escrow balance for amounts expended by Shellpoint for which it was due reimbursement in the amount of $142.07 was correct.[8] *Fourth*, in accordance with Official Form 410(A), RESPA, and applicable case law, the Projected Escrow Shortage was properly claimed as a pre-conversion arrearage.

---

[8]   As of February 28, 2022, the Debtors had no balance in the required escrow account, and in fact owed Shellpoint the $142.07 for monies funded by Shellpoint for which there were no funds to draw out of the escrow for repayment.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

As of February 28, 2022, the Debtors had some $5,290.88 in taxes and insurance coming due by May 2022, though there were no funds in the escrow account.  So, clearly the escrow account was, as of February 28, 2022, "short" of what RESPA allows a lender to maintain, and as shown below, the Projected Escrow Shortage was properly calculated and was properly claimed as a pre-conversion arrearage.  One way to think of this is to consider the situation of the Debtors receiving a new loan on March 1, 2022.  The Debtors would have had to bring to closing amounts equaling the Projected Escrow Shortage (there would have been no Deficiency with a new loan), or Shellpoint would have had to agree to collect the Projected Escrow Shortage through monthly payments under RESPA.  This is because as of February 28, 2022, the principal and interest, late fees, and Deficiency (negative escrow balance for funds expended) were due and owing.  Further, because the tax and insurance obligations would come due in an aggregate amount of $5,200 within two-three months, the Projected Escrow Shortage would have been necessary to fund the escrow as authorized by RESPA, to maintain the authorized statutory cushion and ensure reimbursement to the lender upon payment of the tax and insurance amounts.

Finally, the Debtors could have agreed to pay the arrearage claim through the plan, but rather chose (i) to pay the past due payment outside the plan,[9] (ii) to pay the late fees in a lump sum per the Stipulation, and (iii) to pay the Deficiency plus the agreed Projected Escrow Shortage in accordance with monthly mortgage statements to be issued by Shellpoint.  Importantly, the Projected Escrow Shortage as of the Original POC has not been reduced by additional payments pursuant to monthly statements because Shellpoint has not, to date, added any amount to the monthly statements sent to the Debtors to provide for any additional monthly amounts toward either the Deficiency or the Projected Escrow Shortage. In fact, it may be that as of February 28, 2023, Shellpoint will be in the same position that it was in as of February 28, 2022, because the Deficiency and Projected Escrow Shortage have not been reduced during 2022, but the current Projected Escrow Shortage amount will be determined by a subsequent Annual Escrow Account Disclosure Statement ("Subsequent Escrow Analysis"), and could change due to tax and insurance charges increasing or decreasing.  So, while in

---

[9]    Debtors made the past due payment following conversion of their case to chapter 13, in March, 2022.

one respect it is correct that the Debtors can repay the Projected Escrow Shortage by making the monthly mortgage payments pursuant to monthly statements received from Shellpoint, as of now those monthly mortgage statements have not included any amount to be paid toward the Projected Escrow Shortage or the Deficiency the Debtors agreed in the Stipulation that they owed (as of the date of conversion, just as alleged in the Original POC). If Shellpoint determines to collect the agreed upon pre-conversion arrearage of $4,645.67 or a recalculated amount based upon changed Projected Escrow Shortfall due to the next Subsequent Escrow Analysis, then it can send the changed monthly payment notices under the Stipulation (where it could not if the amounts were part of an arrearage proof of claim to be paid by the chapter 13 trustee), and the Debtors have agreed to abide by those monthly statements.

As shown below, the Respondents agreed to amend the Original POC to $00.00, because the Debtors agreed to treat Shellpoint outside of the plan and in fact, as though no bankruptcy had been filed. Shellpoint accordingly accepted this rescission by the Debtors of the protection offered by chapter 13 to pay arrearages through a plan. Shellpoint has not commenced collection, but, upon filing the proper notice of payment change, it may do so. The Amended POC simply was necessary to implement the Stipulation, the agreement of the Debtors that they would not seek to pay through an arrearage claim through the Amended Plan, but would pay both the Deficiency and the Projected Escrow Shortage outside the Amended Plan and in accordance with monthly statements as may be sent by Shellpoint. In this case such an approach makes sense, as the payment due February 1, 2022 was paid in March, leaving only the late fees (paid in a lump sum) and the Deficiency and Projected Escrow Shortage, with which the Debtors and Shellpoint had dealt in the past, such that treating Shellpoint as though there was no bankruptcy, and under nonbankruptcy law, was easily accomplished.

## LEGAL AUTHORITY

**The Projected Escrow Shortage is an arrearage.**

The crux of the inquiry here is whether the Projected Escrow Shortage amount in the Original POC was properly stated as a pre-conversion claim for arrearage. This Court has stated that it does not think it should have been included, and for this reason, the Court has ordered both Bonial and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Shellpoint to show cause why they should not be sanctioned and counsel referred for proceedings.[10]

2  Respondents show that throughout this process Shellpoint, through Bonial, correctly included the

3  Projected Escrow Shortage in the Original POC as an arrearage, and that the subsequent Stipulation

4  and amendment of the Original POC was fully consistent with the Original POC and the confirmation

5  practice in this Court.

6  ## A. The Escrow Deficiency and Shortage Amounts Stated in Part 3 of the Form 410A
   ## Attached to the Original POC Comply with the Official Instructions for Form 410A.

7

8  The *Instructions For Mortgage Proof Of Claim Attachment* (the "Form 410A Instructions")

9  provide significant guidance on how to identify the amounts listed for "Escrow **deficiency** for funds

10  advanced" and "Projected escrow **shortage**" in Part 3 of the Official Form 410A (emphasis supplied).

11  As shown by the Form 410A Instructions, and as explained below, these are two separate and distinct

12  categories of the arrearage claim.  The Respondents' identification of these amounts in Part 3 of the

13  Official Form 410A attached to the Original POC was correct.

14  **The Original POC was properly calculated from the date of conversion.**

15  Here, as a threshold a matter of law, a chapter 13 claim analysis is from the date of conversion

16  of the Debtors' case from chapter 7 to chapter 13.  This is because under section 348(a) of the

17  Bankruptcy Code, "conversion of a case from a case under one chapter of this title to a case under

18  another chapter of this title constitutes an order for relief under the chapter to which the case is

19  converted." 11 U.S.C. 348(a).  Therefore, here, the date of the order for relief is the date of conversion,

20  or February 28, 2022, for purposes of proceeding in chapter 13 (the fixing of the order for relief for

21  the case under chapter 13 does not affect the petition date or order for relief for other purposes --

22  trustee actions, automatic stay, property of the estate as of commencement of the case, etc.)..  Section

23  1305(a) of the Bankruptcy Code provides that a proof of claim may be filed by "any entity that holds

24  a claim against the debtor—that is a consumer debt, **that arises after the date of the order for relief**

25

26  ---

    [10]    While the Debtors complained that there should be no arrearage claim, clearly they were wrong.  They owed a

27  note payment as of February 1, 2022 that had not been paid as of February 28, and they owed late fees that they
    subsequently agreed that they owed, and they have not really challenged the Deficiency amount.  Further, despite their
    protestations, they have agreed, in the Stipulation, that Shellpoint can collect the Projected Escrow Shortage through

28  monthly payment amounts to be included in monthly statements.

**under this chapter**, and that is for property or services necessary for the debtor's performance under the plan." 11 U.S.C. § 1305(a) (emphasis added); *see also In re Tracy*, No. BR 20-40074-JMM, 2021 WL 4143994, at *10 (Bankr. D. Idaho Sept. 9, 2021). FED. R. BANKR. P. 3002(c) permits a creditor 70 days from the date of the order relief after conversion to a case under chapter 13 to file a claim. FED. R. BANKR. P. 3002(c). As such, in a conversion from chapter 7 to chapter 13, a mortgage lender is permitted to assert claims arising post-petition but pre-conversion and given time in which to do so. Therefore, when calculating a claim for purposes of a converted chapter 13 case, consumer lenders do so from the date of conversion.

### The Negative ($142.07) Amount Stated For "Escrow Deficiency For Funds Advanced" In Part 3 Of The Initial 410A Complies With The Form 410A Instructions.

The Form 410A Instructions state that "Escrow deficiency for funds advanced" "should be the same as the amount of *escrow deficiency* stated in Part 2." The Form 410A Instructions for Part 2 identify this amount as "the amount of any prepetition payments for taxes and insurance that the servicer or mortgagee made out of its own funds and for which it has not been reimbursed." This by definition is any negative balance in the escrow account, as it represents an amount that the creditor has been required to pay out of its own funds. It is the identical concept as the "deficiency" definition in the Escrow Regulation (as defined below). Upon information and belief, there is no dispute that the balance in the Debtors' escrow account as of the Conversion Date was negative ($142.07). Therefore the Original POC for the Deficiency was correct. *See* Escrow Disclosure, submitted with Original POC at p. 40:

| Date | Payments to Escrow Anticipated | Actual | Payments From Escrow Anticipated | Actual | | Description | Escrow Balance Required | Actual |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Starting Balance | 2,178.47 | (1,628.95) |
| Jul 2021 | 726.18 | 805.50 | | | * | | 2,904.65 | (823.45) |
| Aug 2021 | 726.18 | 805.50 | | | * | | 3,630.83 | (17.95) |
| Sep 2021 | 726.18 | 805.50 | | | * | | 4,357.01 | 787.55 |
| Oct 2021 | 726.18 | 805.50 | | | * | | 5,083.19 | 1,593.05 |
| Nov 2021 | 726.18 | | | | * | | 5,809.37 | 1,593.05 |
| Nov 2021 | | | | 4,155.82 | * | County Tax | 5,809.37 | (2,562.77) |
| Dec 2021 | 726.18 | 805.50 | 3,789.55 | | * | County Tax | 2,746.00 | (1,757.27) |
| Dec 2021 | | 4.20 | | | * | Int on Escrow Pmt | 2,746.00 | (1,753.07) |
| Jan 2022 | 726.18 | 805.50 | | | * | | 3,472.18 | (947.57) |
| Feb 2022 | 726.18 | 805.50 | | | * | | 4,198.36 | (142.07) |
| | | | | | | Anticipated Transactions | 4,198.36 | (142.07) |
| Feb 2022 | | * | | | | | | (142.07) |
| | $5,809.44 | $5,642.70 | $3,789.55 | $4,155.82 | | | | |

14

DOCS_LA:346385.3 10224/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Therefore, the Respondents' listing of this amount for "Escrow deficiency for funds advanced" in Part 3 of the Initial 410A was correct.

| Part 3: Arrearage as of Date of the Petition | |
|---|---|
| Principal & interest due: | $2,739.75 |
| Prepetition fees due: | $547.96 |
| Escrow deficiency for funds advanced: | $142.07 |
| Projected escrow shortage: | $4,503.60 |
| Less funds on hand: | $0.00 |
| Total prepetition arrearage: | $7,933.38 |

Going forward, the Projected Escrow Shortage is calculated from a $0 balance as of March 1, 2022 (post-conversion), because this $142.07 negative balance is accounted for in the "Escrow deficiency for funds advanced" line item.

### The $4,503.60 Amount Stated For "Projected Escrow Shortage" In Part 3 Of The Initial 410A Complies With The Form 410A Instructions.

The Form 410A Instructions for "Projected escrow shortage" state:

> The *projected escrow shortage* is the amount the claimant asserts should exist in the escrow account as of the petition date, less the amount actually held. The amount actually held should equal the amount of a positive escrow account balance as shown in the last entry in Part 5, Column O. This calculation should result in the amount necessary to cure any prepetition default on the note or mortgage that arises from the failure of the borrower to satisfy the amounts required under the Real Estate Settlement Practices Act (RESPA). The amount necessary to cure should include 1/6 of the anticipated annual charges against the escrow account or 2 months of the monthly pro rata installments due by the borrower as calculated under RESPA guidelines. The amount of the projected escrow shortage should be consistent with the escrow account statement attached to the *Proof of Claim*, as required by Rule 3001(c)(2)(C).

For multiple reasons, this is the precisely the same concept as "shortage" in 12 C.F.R. § 1024.17.[11]

---

[11]    The current federal regulation relating to escrow computations – 12 C.F.R. § 1024.17 (the "Escrow Regulation"). The Escrow Regulation was promulgated pursuant to the authority provided by numerous sections of RESPA.  12 U.S.C. § 2601 et seq., most specifically 12 U.S.C. § 2609 ("Limitation on requirement of advance deposits into escrow accounts"). The Escrow Regulation was originally promulgated and located at 24 C.F.R. § 3500.17 prior to January 2014, when it was relocated to 12 C.F.R. § 1024.17 pursuant to the 2010  Dodd–Frank Wall Street Reform and Consumer Protection

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*First*, the drafters of the Form 410A Instructions used the word "shortage," the same word used in the Escrow Regulation.  They easily could have used "deficiency," "amount past due," "arrears," etc., but they did not.

*Second*, the first sentence is effectively the precise definition of "shortage" under the Escrow Regulation.  Compare (1) "amount the claimant asserts should exist in the escrow account as of the petition" (Form 410A Instructions) with (2) the "amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis" ("escrow" in Escrow Regulation").

*Third*, the third sentence makes it clear that "Projected escrow shortage" is a RESPA concept – ". . . required under the Real Estate Settlement Practices Act (RESPA)."

*Fourth*, the fourth sentence clearly refers to the "cushion" under the Escrow Regulation – "funds that a servicer may require a borrower to pay into an escrow account to cover unanticipated disbursements or disbursements made before the borrower's payments are available in the account, as limited by §1024.17(c)."  Section 1024.17(c)(1)(ii) in turn provides that ". . . the servicer may add an amount to maintain a cushion no greater than one-sixth (1/6) of the estimated total annual payments from the account."  The fourth sentence's language that "[t]he amount necessary to cure should include 1/6 of the anticipated annual charges against the escrow account . . ." would have no meaning unless it was specifically referring to the "cushion" under the Escrow Regulation, as without that source of meaning the language would be unmoored, and relate to nothing.  Because (1) "cushion" is used in the definition of "target balance" in the Escrow Regulation:

> "[T]he estimated month end balance in an escrow account that is just sufficient to cover the remaining disbursements from the escrow account in the escrow account computation year, taking into account the remaining scheduled periodic payments, and a cushion, if any.

and (2) "target balance" is used in the definition of "shortage" in the Escrow Regulation:". . . amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis," the fourth sentence of the Form 410A Instructions for "Projected escrow shortage" must refer to the exact same concept as "shortage" in the Escrow Regulation.

Act.  *See, e.g, McCray v. Bank of America, Corp.*, 2017 WL 1315509, at *3 (D. Md. Apr. 10, 2017) (discussing the history of the Escrow Regulation).

16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

***Fifth***, the fifth sentence leaves no doubt.  It plainly states that the "amount of the projected escrow shortage" should be consistent with the petition-date escrow statement attached to the proof of claim.  That escrow statement of course "must be prepared in a form consistent with the requirements of [RESPA]." Fed. R. Bank. P. 3001 Advisory Committee Notes - 2011 Amendments ("The statement must be prepared in a form consistent with the requirements of nonbankruptcy law. *See*, *e.g.*, 12 U.S.C. § 2601 *et seq.* (Real Estate Settlement Procedure Act)").  If (1) the "Projected escrow shortage" must match the escrow statement attached to the proof of claim and (2) the escrow statement must be prepared in accordance with RESPA, then the "Projected escrow shortage" must be a RESPA term.

Here, the Escrow Projection submitted with the Original Proof of Claim sets forth as follows:

**Annual Escrow Account Disclosure Statement - Projections for Coming Year**

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made to and from your account

| Date | Anticipated Payments To Escrow | From Escrow | Description | Escrow Balance Anticipated | Required |
|------|------|------|------|------|------|
| | | | Starting Balance | 0.00 | 4,503.60 |
| Mar 2022 | 787.22 | | | 787.22 | 5,290.82 |
| Apr 2022 | 787.22 | 4,155.82 | County Tax | (2,581.38) | 1,922.22 |
| May 2022 | 787.22 | 1,135.00 | Hazard | (2,929.16) | 1,574.44 |
| Jun 2022 | 787.22 | | | (2,141.94) | 2,361.66 |
| Jul 2022 | 787.22 | | | (1,354.72) | 3,148.88 |
| Aug 2022 | 787.22 | | | (567.50) | 3,936.10 |
| Sep 2022 | 787.22 | | | 219.72 | 4,723.32 |
| Oct 2022 | 787.22 | | | 1,006.94 | 5,510.54 |
| Nov 2022 | 787.22 | | | 1,794.16 | 6,297.76 |
| Dec 2022 | 787.22 | 4,155.82 | County Tax | (1,574.44) | 2,929.16 |
| Jan 2023 | 787.22 | | | (787.22) | 3,716.38 |
| Feb 2023 | 787.22 | | | 0.00 | 4,503.60 |
| | $9,446.64 | $9,446.64 | | | |

(Please keep this statement for comparison with the actual activity in your account at the end of the escrow accounting computation year)

Your ending balance from the last month of the account history (escrow balance anticipated) is (0.00).  Your starting balance (escrow balance required) according to this analysis should be $4,503.60.  This means you have a shortage of 4,503.60. This shortage may be collected from you over a period of 12 months or more unless the shortage is less than 1 month's deposit, in which case we have the additional option of requesting payment within 30 days.  We have decided to do nothing. We anticipate the total of your coming year bills to be9,446.64.  We divide that amount by the number of payments expected during the coming year to obtain your escrow payment.

| New Escrow Payment Calculation | |
|------|------|
| Unadjusted Escrow Payment: | $787.22 |
| Surplus Reduction: | $0.00 |
| Shortage Installment: | $0.00 |
| Rounding Adjustment Amount: | $0.00 |
| Escrow Payment: | $787.22 |

Original POC at p. 41.  As of March 1, 2022 (the day after conversion), looking forward, a payment of $4,155.82 was to be made for County tax in April 2022; $1,135.00 for hazard insurance in May 2022; and $4,155.82 for County tax in December 2022.  *Id*.  Therefore, over the course of the next twelve (12) months, the total anticipated payments from escrow is $9,446.64.  *Id*.  So the new escrow payment is calculated as $787.22 per month.  *Id*.

The Escrow Projection shows that of March 1, 2022, the Debtors had $0 in their escrow account (actually this was a negative amount but $0 for purposes of this calculation).  *See* Original POC at 41. So to calculate the Projected Escrow Shortage, Shellpoint calculated the target balance for tax and

DOCS_LA:346385.3 10224/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

insurance with the requisite two month cushion.  With payments of 1/12 of the annual disbursements in the amount of $787.22 plus the projected escrow disbursements, a low point of negative $2,929.16 would be reached after the payment and disbursement in May 2022.  Given that the low point can be no lower than two months of the estimated 1/12 payments ($1,574.44), the $4,503.60 sum of these two numbers ($2,929.16 and $1,574.44) is the starting "target balance" for the escrow account, as is the Projected Escrow Shortage.

Clearly, then, the terms "Escrow deficiency for funds advanced" and "Projected escrow shortage" are distinct, and different.  The Projected Escrow Shortage, by definition ("projected") unambiguously refers to a projection of a future target amount, while "deficiency" refers to the amount the lender has paid out, for which it cannot draw funds from escrow for repayment, an unambiguously backward looking calculation.

Courts agreeing with the position taken here by Respondents have recognized that "the timing of the expected escrow disbursements can have a major impact on the determination whether an escrow shortage exists." *See In re Chew*, 627 B.R. 112, 116–17 (Bankr. E.D. Pa. 2021) (providing examples of how the month the analysis is run can change the projected escrow shortage).  Here, for instance, had conversion occurred May 31, 2022, the April 2022 County tax payment of $4,155.82, and May 2022 hazard insurance payment of $1,135.00, would already have come due (and for these purposes assumed not to have been paid by the Debtors, but by Shellpoint).  Rather than being part of the Projected Escrow Shortage, these amounts would have been captured in the "escrow deficiency for funds advanced" portion of Official Form 410A.  But, because conversion here occurred on February 28, 2022, before these payments were made, the Projected Escrow Shortage had to account for the payment of these amounts by Shellpoint despite insufficient funds within the escrow to cover, plus the cushion afforded by RESPA and the Form 401(A) Instructions.

The $4,503.60 amount stated in Part 3 of the Initial 410A for "Projected escrow shortage" is the difference between the "amount [Shellpoint] asserts should exist in the [escrow account] as of the petition date" ($4,503.60) and the amount actually held in the escrow account as of Conversion Date ($0).  As such, it complies with the Form 410A Instructions for "Projected escrow shortage."  And, because

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Projected escrow shortage is to be made a component of a proof of claim by a lender such as Shellpoint, the Original POC was, without question, correct.

### B. A projected escrow shortage is an arrearage.

The Respondents correctly followed RESPA and Form 410A Instructions, and properly calculated the projected escrow shortage as of conversion. Therefore, the next issue raised by the Court appears to be whether a projected escrow shortage is an arrearage. This question came before a district court on appeal in *JPMorgan Chase Bank, National Association v. DeGuiseppi*, where the bankruptcy court denied the projected escrow shortage component of the bank's proof of claim. 2019 WL 1724629, at *1. In that case, when performing the projected escrow shortage calculation, the bank treated the balance of the escrow account as though it were $0.00. *Id*. at *2. The debtor filed an objection to the bank's proof of claim. *Id*. The essence of the objection was that the projected escrow shortage cannot be prepetition debt because any shortage here would occur after the filing of the petition; the debtor therefore believed the projected escrow shortage should be excluded from the proof of claim. *Id*. That is the position taken by the Debtors here, and espoused by this Court thus far. In response, the bank argued, just as Respondents argue here, the inclusion of the projected escrow shortage as prepetition arrearage/debt was proper pursuant to RESPA, the Bankruptcy Rules and the Official Forms. *Id*. The bankruptcy court largely sustained the debtor's objection and the appeal followed. *Id*.

On appeal, the district court determined whether the bank's proof of claim should be allowed hinged upon "whether a projected escrow shortage is indeed prepetition debt in a Chapter 13 bankruptcy proceeding and, if so, whether [the bank's] calculation is correct." *Id*. at *3. In concluding that projected escrow shortages may constitute prepetition claims, the district court explained that:

> "Claim" includes a "right to payment, whether or not such right is .... fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). Regulation X, provides that in the case of a projected escrow shortage, "[t]he servicer may allow a shortage to exist and do nothing to change it," or "[t]he servicer may require the borrower to repay the shortage in equal monthly payments over at least a 12-month period." 12 C.F.R. § 1024.17(f)(3)(ii). Additionally, if the shortage is less than the amount of one payment, "[t]he servicer may require the borrower to repay the shortage amount within 30 days." 12 C.F.R. § 1024.17(f)(3)(i)(B). **Therefore, RESPA allows a claim for a projected escrow**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

**shortage at the time it is calculated, not only when a shortage occurs**, indicating in this context it can be a prepetition claim.

*Id*. at *2–3 (emphasis added). The court further cited to the Form 410A Instructions to support its interpretation; which "state the total prepetition arrearage should include the projected escrow shortage." *Id*. Therefore, the district court reversed the bankruptcy court's order on the projected escrow shortage component of the bank's proof of claim and remanded. *Id*. at *3.

The *DeGuiseppi* court is not alone in finding that a projected escrow shortage is properly included as an arrearage. In *Campbell*, the bankruptcy court considered whether amounts set forth in the mortgage lender's proof of claim correctly stated the amount necessary to cure the default on the debtor's mortgage, including the insurance/property tax escrow costs asserted. *In re Campbell*, Case No. 17-31411, 2018 WL 2339334 (Bankr. N.D. Ohio May 22, 2018). The court determined that: "including amounts for 'Projected escrow shortage' in its arrearage claim does not violate RESPA's collection rule" and accordingly, the creditor had met its burden in terms of establishing the validity of the projected escrow shortage component of its secured claim. *Id*. at *4.

Further, nothing about Official Form 410(A), RESPA, or the analysis of the case authority, conflicts with the relevant provision of the Bankruptcy Code, section 1322(e). As the court in *Campbell* recognized, section 1322(e) of the Bankruptcy Code provides:

> (e)   Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

11 U.S.C. § 1332(e ); *Campbell*, 2018 WL 2339334, at *3. Because of the existence of an arrearage claim, the Debtors' Plan had to provide to cure the default. In this case, the Debtor was factually and legally incorrect that there was no arrearage to cure in the Original Plan, and the Plan Objection was correct to point out that the Debtors' Plan made no provision (payments inside the plan or outside the plan) for curing of the arrearages. Calculating an arrearage amount based upon nonbankruptcy law, and implementing the claim through use of Official Form 410A, cannot conflict with or contravene substantive law, as section 1322(e) of the Bankruptcy Code requires that the default to be cured be determined under nonbankruptcy law and the underlying agreement (here the loan documents and

DOCS_LA:346385.3 10224/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

RESPA).  In fact, the Debtors have now through the Stipulation recognized the correctness of Respondents' actions. view of the facts, and Original POC, and have agreed to provide cure under nonbankruptcy law of the amount determined under nonbankruptcy law (less the benefits of the settlement - no further late charges and no additional attorney fees).

In the case *In re Breit*, decided before Official Form 410A was enacted, the chapter 13 trustee objected to a proof of claim filed by a mortgage creditor on the ground that the creditor's arrearage claim was overstated.  490 B.R. 821 (Bankr. N.D. Ind. 2013).  There, the bankruptcy court expressly recognized that the lender "has a right to a prepetition claim for the escrow deficiency," but at issue in *Breit* was the calculation thereof.  *Id*. at 825.  Specifically, the lender argued that because the then applicable B 10 Attachment A Form failed to account for recovery of the escrow portion of pre-petition past due note payments, it had to employ a "mathematical manipulation" to calculate the escrow shortage to include the sum of the escrow components of the missed prepetition payments, and therefore added to its claim the escrow component of the missed prepetition payments, opposed to the RESPA "shortage" or the actual escrow "deficiency.".  *Id*. at 826.[12]

In contrast, the trustee argued that rather than include this $7,145.76 sum of the escrow components of the 24 missed prepetition payments, the RESPA "deficiency" of $2,909.37 and the RESPA "shortage" of $857.04 should be included in the prepetition arrearage.  *Id*. at 823.  The bankruptcy court agreed with the trustee.  It critiqued the bank's calculation finding that the provisions under RESPA for calculating escrow deficiencies that should be used are "straightforwardly spelled out" as the "shortage" and deficiency" as defined by RESPA.  *Id*. at 826.  So even before Official Form 410A was enacted clarifying this concept, according to the *Breit* court, prepetition arrearages were to be calculated by looking to the RESPA definition of shortage and deficiency.  As is clear from the record here, Shellpoint calculated its arrearage in accordance with *DeGuiseppi, Chew, Campbell, and Breit.*

Therefore, not only does Official Form 410A require and RESPA provide for explicitly that projected escrow shortages be asserted as pre-petition or pre-conversion arrearages, but applicable

---

[12]    The debtor had missed some 24 payments prepetition, and the lender included the escrow portion of the missed payments, or $297.74 per month (totaling $7,145.76).

case law also holds that a properly calculated projected escrow shortage is a prepetition arrearage. Therefore, Respondents *properly* included an accurately calculated Projected Escrow Shortage in its Original POC as an arrearage as of the Conversion Date (proper here), because that is precisely what Official Form 410A demands, and what RESPA allows.  As of the date of conversion, RESPA permitted Shellpoint to claim amounts due for a projected escrow shortage and therefore, the Projected Escrow Shortage was an arrearage.

**C. The Significant Sum of the Escrow "Deficiency" and "Shortage" Components in Part 3 of the Initial 410A had Multiple Causes -- The Debtors' (Actual) Payment History.**

Here, perhaps the result might on the surface seem somewhat anomalous: Debtors were nearly current on their mortgage payments as of conversion (one payment past due, but multiple prior past due payments generating the arrearage claim for late fees), yet Shellpoint asserted a material claim for Projected Escrow Shortage.  But, even if the Debtors were close to current on mortgage payments, their escrow account had a **negative** balance.  The $4,645.67 sum of the negative ($142.07) Deficiency and the $4,503.60 Projected Escrow Shortage" in Part 3 of the Official Form 410A attached to the Original POC is a significant amount.  An obvious question that may have occurred to the Court is: How could there be a Projected Escrow Shortage of $4,503.60, when the Debtors were only one payment behind as of February 28, 2022?  First, Respondents have shown the calculations by which the Original POC components were determined.  Second, though, and in answer to this other question, there are three sub-part answers: (1) a *2020 Loan Modification Agreement* (the "LMA") was agreed to in January 2020, which provided the Debtors relief by, among other things, folding in a substantial escrow **deficiency** into a new principal balance (*see* the LMA attached to Original POC); (2) the Debtors and Shellpoint entered into a three-month forbearance for July-September 2020; and (3) Shellpoint's decision in three (3) prepetition escrow analyses (the first done in connection with the LMA) not to require the Debtors to pay back the sum of the escrow "shortage" and "deficiency" immediately or over the following 12 months after the analysis, but rather to spread it out over 60 months, for a time, and then 48 months after subsequent analyses, as shown below.

***First***, the Escrow Disclosure immediately recognized a significant projected "shortage" when the 2020 LMA was executed.  *See* Original POC at p.9 -18 (LMA); Exhibit A to Declaration of Melba

22

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Arredondo in Support [Annual Escrow Account Disclosure Statement - Account History January 28, 2020, (the "January 2020 Escrow Analysis")]. Shellpoint "zero'ed out" the balance of the escrow account by adding to the principal amount of the modified loan the $5,219.88, negative balance in the escrow account, or escrow deficiency. But Shellpoint did not fund the escrow account to the RESPA "target balance" in the January 2020 Escrow Analysis, by adding that amount ($3,376.25) to the modified loan principal balance, or by making the Debtors prepay the $3,376.25 projected "escrow shortage" as of the closing of the LMA. The $3,376.25 projected "escrow shortage" was calculated in the January 2020 Escrow Analysis using a March 2020-February 2021 "escrow account computation year".

*Second*, Shellpoint initially provided for the Debtors to repay the $3,376.25 projected "shortage" recognized in the January 2020 Escrow Analysis over a 60 month period. Subsequently, Shellpoint determined the existence of both a "shortage" and a "deficiency" in a May 2020 escrow analysis (totaling $3,253.55) and again in a May 2021 escrow analysis (totaling $3,806.92). *See* Exhibit B to Declaration of Melba Arredondo [Annual Escrow Account Disclosure Statement Account History, May 22, 2020, the ("May 2020 Escrow Analysis")]; Exhibit C to Declaration of Melba Arredondo [Annual Escrow Account Disclosure Statement Account History, May 18, 2021, (the "May 2021 Escrow Analysis")]. Rather than require as it could have that the Debtors pay the deficiency and shortage amounts over a 12 month period, Shellpoint initially provided for a 60 month repayment period and subsequently reduced the repayment period to a 48 month period (this was the applicable period for repayment as of the Conversion Date).

RESPA allows a creditor to demand repayment of any escrow "**deficiency**" that exceeds one month's escrow payment over a two-month period. 12 C.F.R. § 1024.17(f)(4)(ii). It also allows a creditor to demand repayment of any escrow "**shortage**" that exceeds one month's escrow payment over a 12-month period. 12 C.F.R. § 1024.17(f)(3)(ii). Shellpoint chose not to do this in each of the January 2020, the May 2020, and the May 2021 Escrow Analysis. Instead, it required repayment of the "shortage" in the January 2020 Escrow Analysis over 60 months, required repayment of the sum of the "shortage" and "deficiency" in the May 2020 Escrow Analysis over 60 months, and required repayment of the sum of the "shortage" and "deficiency" in the May 2021 Escrow Analysis over 48

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

23

months.   Put simply, Shellpoint's generous treatment for repayment resulted in the recognized significant escrow "shortages" and "deficiencies."  In addition, the general increase during this period of annual tax and insurance amounts, caused the situation that the Debtors were effectively not reducing the escrow shortages with the small additional monthly payments they were making in addition to the Base Payments.

***Third***, the *Deferment Agreement* the Debtors received on September 4, 2020 resulted in the July-August 2020 payments being advanced for the Loan on a contractual basis for recordkeeping purposes without the $786.73 monthly escrow amount being paid for those three months.  See Exhibit D to Declaration of Melba Arredondo [Deferment Agreement effective 10/01/2020, the "Deferment Agreement")].   This obviously affected the balance in the escrow account and the resulting "deficiencies" and "shortages" recognized in the subsequent May 2021 Escrow Analysis and the February 2022 Escrow Analysis, simply because those three escrow payments (a total of $2,360.19) were not in the escrow account as of the dates of those analyses.

Of critical importance here, applicable law permits mortgage lenders to claim amounts to fund these expected obligations before they are actually incurred, as pre-petition, or as in this case, pre-conversion claims for arrearages.  Simply, that is the law, that is what is allowed and required.  And that is what Respondents did.  Should this Court believe the result improper, then it would have to eschew RESPA and the Official Form 410(A) Instructions to find that a claim for a projected escrow shortage only arises when the lender expends its own funds for which there are no escrow funds for reimbursement.    However, Respondents can see no ground for eschewing applicable law.  Respondents followed the law and Form 410(A), complying with the way lenders are instructed to complete the proof of claim form.

**D.  Chapter 13 Plans should not be confirmed unless they address prepetition claims.**

Shellpoint, through Bonial, filed the Plan Objection because the Original Plan stated that the "amount of arrearage, if any" was $0.00, and Shellpoint knew that its forthcoming Original POC would include an amount for arrearages.  *See* Original Plan, at Class 4.  The Original Plan was thus legally and factually incorrect and therefore, the Plan Objection was proper.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**E.  In order to effectuate confirmation after the Shellpoint Objection was resolved, the Original POC was amended.**

The Court appears troubled by the fact that in resolving this dispute, Shellpoint, through Bonial, amended the Original POC to reflect no arrearage.  Therefore, it seemingly appears that to the Court, either the Original POC was false because it asserted an arrearage or the Amended POC was false because it did not assert an arrearage.  **In fact, the opposite is true.**  The amendment of the Original POC was as a practical matter necessary to effectuate confirmation, not a disavowal of the Projected Escrow Shortage; and in fact, because the Stipulation incorporated the Original POC, the amendment was necessary.

Recall that well before this issue was raised before the Court, Bonial informed the Debtors that the escrow arrearage claim was $4,645.64, but if the Debtors agreed to "pay the estimated escrow shortage over 12 months, consistent with RESPA process" then Shellpoint would amend its proof of claim to $0.  *See* Docket #64-5.  What Bonial sought was assurance from Debtors that they would pay the Projected Escrow Shortage in accordance with RESPA, through monthly prorated payments (RESPA allows the collection over a 12 month period).  In the Stipulation, the Debtors agreed to make payments to cure the Deficiency and Projected Escrow Shortage through monthly payments in accordance with monthly statements to be issued by Shellpoint.  Under the Stipulation, RESPA and a determination by Shellpoint in accordance with RESPA will govern the amount to be added to monthly statements (in the future), as the Debtors have agreed that nonbankruptcy law and their loan agreement with Shellpoint will govern treatment and collection of the Projected Escrow Shortage.  Because and in consideration of the Stipulation, Shellpoint filed the Amended POC, with a $0 arrearage.

As this Court is aware, numerous times throughout the form chapter 13 plan, it is clear that the amount set forth in a proof of claim controls over any amounts set forth in a plan.  *See e.g.* Form Plan, Class 3C; Class 4 (providing that "[t]he dollar amount of arrearage state on a proof of claim controls over any amount listed…[in a plan].").  Perhaps as a consequence of this language, practically, a plan will not be confirmed if the amounts in the plan differ from the amounts set forth in the proof of claim.  In fact, the standard process in this jurisdiction in preparation for confirmation is for the chapter 13 trustee to file a statement which either supports or objects to confirmation.  The chapter 13 trustee addresses any claim amounts that differ from the plan, and in this case, specifically references the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

25

Stipulation. *See* Docket # 83. In Respondents' experience in this jurisdiction, it is thus standard practice to amend proofs of claim in accordance with agreements reached with debtors, when the mortgage loan is to be treated outside the plan. Here, the effect of the Stipulation is: **(i)** Shellpoint agreed that the Debtors had paid the note amount due as of February 1, 2022, and that it would not charge an additional late fee**; (ii)** the Debtors agreed that the claimed amount of late fees was due and to pay in a lump sum rather than through the plan; **(iii)** the Debtors agreed that the Projected Escrow Shortage and the Deficiency balance were due as arrearages and to pay those amounts outside the plan, in accordance with monthly statements to be sent by Shellpoint; **(iv)** the Debtors agreed that they would maintain their mortgage loan current (which they had not done prior to conversion); and **(v)** the parties agreed to pay their own attorney fees and costs. The Debtors, therefore waived the right to pay the arrearages through the plan. The Mortgage payment plus the late fees (totaling $3,287.71) were paid in lump sums as opposed to through the plan. Once Shellpoint commences billing the Deficiency and Projected Escrow Shortage amounts, agreed by the Debtors to be $4,645.64 (the Deficiency plus Projected Escrow Shortage), that amount will be paid outside the plan as well, by the monthly payments equaling the monthly payment notices from Shellpoint (that admittedly have not commenced). For this agreement, and the Debtors' payment of the past due note payment (principal and interest, which they paid in two payments in March, 2022), Shellpoint agreed not to charge additional late fee claims as of the date of the Stipulation, and not to charge additional fees and costs. In no way does the Stipulation contravene the Original POC, but in fact recognizes it, and the Debtors have agreed to the amounts due and how to pay the amounts due. All the Amended POC did was to make certain that Shellpoint was not "double dipping," and by amending the Original POC Shellpoint necessarily removed an obstacle to confirmation from the perspective of the chapter 13 trustee.

**F.  These facts cannot give rise to a Rule 11 or ethical violation, or any sort of sanction.**

Even if this Court's ultimate conclusion is that the reasoning in *DeGuiseppi*, *Chew*, and *Campbell*, and *Breit*, the instructions in Official Form 410A, along with the statutory and regulatory provisions of RESPA, somehow should not be followed, or are incorrect, sanctions cannot issue, and Respondents did nothing wrong. In fact, all the Debtors said in their Claim Objection, boiled down,

is that the Official Form, RESPA, and the cited case law are incorrect according to how they feel the law should be.  Frankly, without legal argument, their position, now withdrawn, cannot hold sway.

FED. R. CIV. P. 11, made applicable hereto by FED. R. BANKR. P. 9011, only applies where a pleading is legally frivolous and/or factually misleading. *Truesdell v. S. California Permanente Med. Grp.*, 293 F.3d 1146, 1153 (9th Cir. 2002) (citing FED. R. CIV. P. 11(b)(2), (3)).  Here, where there is case law on point finding that a projected escrow shortage is properly included as a pre-petition or pre-conversion arrearage (and no case law Respondents could find opposing this view), the Form 410A Instructions instruct the same, and RESPA is without question squarely on point, it cannot be said that following applicable case law, the Official Form, and applicable statutory and regulatory law to the letter could be acting in a misleading or legally frivolous manner.  Further, as set forth herein, the amount of the asserted Projected Escrow Shortage was properly calculated under applicable RESPA law.  Therefore, the Original POC and Plan Objection were not factually misleading, were not false, and were not incorrect.  Neither did the Stipulation cast doubt on the legal and factual correctness of the Original POC.  Further, the Amended POC reflects the practices of this jurisdiction, and could not mislead anyone as it unambiguously agrees to the amount of the Projected Escrow Shortage, the negative escrow balance claim, and most importantly, how these amounts are to be paid outside the plan, in accordance with monthly statements to be sent by Shellpoint, should Shellpoint determine to file an appropriate Notice of Payment Change and commence monthly statements including amounts pro-rated monthly to cover the Projected Escrow Shortage, plus the Deficiency.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

27

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## CONCLUSION

Case law allows mortgage lenders to assert a claim for calculated projected escrow shortages as prepetition arrearages, even before the shortage has actually occurred.  In fact the Official Form has a line item for Projected escrow shortfall, which has to be, by its own language, forward looking.  The practicalities discussed above show that this is correct.  As of February 28, 2022 Shellpoint was facing further funding and a shortfall in the escrow account.  The Projected escrow shortages amount is designed to give mortgage lenders an arrearage claim for such amounts, calculated within the confines of Official Form 410(A) and RESPA.  The Respondents followed these guidelines.  The practical consequence is that Debtors who were close to current on payments but had a negative escrow balance and had to deal with a claim based on a projected escrow shortage.  This Court has announced, in its predetermination of wrongdoing of Respondents, that it finds the Official Form 410A and the applicable law unpalatable (we point out that the Debtors did not provide the Court with any law or legal argument that the actions of Respondents were wrong).  However, as shown in this Response, the concept and law governing proofs of claim and providing for a valid claim for the Projected Escrow Shortage arrearage claim make perfect sense.  Here, the Debtors as of February 28, 2022 had a zero escrow balance and some $5,200 to pay in three months.  No lender would make a loan and allow a new borrower to enter the loan with such a deficiency, but rather would require either cash payment at closing or rolling the amounts into the loan (doubtful).  Seen from this perspective the Projected Escrow Shortage concept makes perfect sense and is not unpalatable.  It is not for the Respondents to determine what the law should be; rather, like any lawyers, Bonial has advocated for its client clearly and completely within the terms and conditions of applicable law and procedure, and there can be no argument that Shellpoint provided proper calculations and analyses of its claim under applicable law.  Any sanction here would be for following the law, which is clearly not the correct ground for any sanction this Court has authority to issue.

1    The Respondents respectfully submit that their conduct has been legal, ethical, and has

2   comported with applicable law and required forms and process.  Despite this Court's assertions to the

3   contrary, there has been no misconduct, no sanction should issue against the Respondents and this

4   Court's OSC should be rescinded and withdrawn.

5   Dated:    January 10, 2023                         KELLY HART & PITRE

6

7                                                      Louis M. Phillips (LA State Bar No. 10505)
                                                       *Pro Hac Vice* Pending
8                                                      301 Main Street, Suite 1600
                                                       Baton Rouge, LA 70801
9                                                      Telephone:  225/381-9643
                                                       Facsimile:  225/336-9763
10                                                     Email:  louis.phillips@kellyhart.com

11                                                     PACHULSKI STANG ZIEHL & JONES LLP

12                                                     */s/ Jeffrey W. Dulberg*
                                                       Jeffrey W. Dulberg (State Bar No. 181200)
13                                                     10100 Santa Monica Blvd., 13th Floor
                                                       Los Angeles, CA 90067
14                                                     Telephone: 310/277-6910
                                                       Facsimile: 310/201-0760
15                                                     E-mail:  jdulberg@pszjlaw.com

16                                                     *Attorneys for Bonial & Associates, PC*

17                                                     BRADLEY ARANT BOULT CUMMINGS LLP

18                                                     Glenn E. Glover (AL State Bar No. 2983G53G)
                                                       *Pro Hac Vice Pending*
19                                                     1819 Fifth Avenue North
                                                       Birmingham, Alabama 35203
20                                                     Phone: (205) 521-8000
                                                       Facsimile: (205) 488-6647
21                                                     Email: gglover@bradley.com

22                                                     *Attorney for Newrez LLC d/b/a Shellpoint*
                                                       *Mortgage Servicing*
23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

                                              29

DOCS_LA:346385.3 10224/001

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California  90067**

A true and correct copy of the foregoing document entitled (*specify*):  ***SUPPLEMENTAL RESPONSE OF BONIAL & ASSOCIATES, PC AND THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATE HOLDERS OF THE CWMBS INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-OA5, MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2006-OA5, AS SERVICED BY NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING TO AMENDED ORDER TO SHOW CAUSE*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **January 10, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) **January 10, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 10, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

       **VIA OVERNIGHT DELIVERY**
       Honorable Wayne Johnson
       United States Bankruptcy Court
       Central District of California
       3420 Twelfth Street, Suite 384 / Courtroom 304
       Riverside, CA 92501-3819

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 10, 2023 | Nancy H. Brown | /s/ Nancy H. Brown |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- *Rod Danielson (TR)     notice-efile@rodan13.com*
- *Gilbert A Diaz     gilbertdiaz@lawyer.com*
- *Shannon Johnson     shannon.johnson@jcap.com*
- *Austin P Nagel     Kim.Bellanger-Smith@BonialPC.com, Notices.Bonial@ecf.courtdrive.com*
- *Alipt Patel     apatel3@aisinfo.com*
- *Arvind Nath Rawal     arawal@aisinfo.com*
- *Cameron C Ridley     Cameron.Ridley@usdoj.gov*
- *United States Trustee (RS)     ustpregion16.rs.ecf@usdoj.gov*

2. <u>**SERVED BY UNITED STATES MAIL**</u>:

<u>**Debtors**</u>
Jose L. Granados
Victoria Ann Gutierrez Vaughn
6158 Royal Diamond Court
Corona, CA  92880

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**